IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-00951-PAB-STV

JON DEAN,

      Plaintiff,

v.

WRIGHT MEDICAL TECHNOLOGY, INC.,

      Defendant.

---

## ORDER

This matter is before the Court on Defendant's Partial Motion to Dismiss Plaintiff's Complaint [Docket No. 8]. Plaintiff responded, Docket No. 15, and defendant replied. Docket No. 22. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND[1]

This case arises out of issues plaintiff experienced after a hip replacement with hardware that defendant manufactured. *See generally* Docket No. 1.

### A. Defendant's Development of Metal-on-Metal Hip Devices

Defendant has designed, developed, manufactured, marketed, and sold prosthetic orthopedic devices. *Id.* at 2, ¶ 5. Between approximately 2003 and 2011, defendant marketed and sold several metal-on-metal ("MoM") hip-replacement devices. *Id.* at 3, ¶ 10. One of these MoM devices, which is at issue in this case, is the Dynasty® Total Hip System (the "Dynasty Device"). *Id.* at 2–3, ¶¶ 5, 10. The Dynasty Device includes five

---

[1] The Court assumes that the allegations in plaintiff's Complaint for Damages [Docket No. 1] are true in considering this motion to dismiss. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

metal components: "(1) a stem inserted into the patient's femur, (2) a neck that connects the stem to (3) a BFH metal femoral head (which [defendant] called the 'BFH' – for 'big femoral head' – and the A-Class BFH), (4) a metal liner, and (5) an acetabular shell."  *Id.* at 3, ¶ 11.

The Dynasty Device – like all hip-implant devices – is regulated by the Food and Drug Administration ("FDA") as a Class III medical device.  *Id.*, ¶ 12.  The FDA requires all Class III devices to comply with either the pre-market approval process ("PMA") or the section 510(k) substantial equivalence pre-market clearance process ("510(k) Clearance")[2] before a manufacturer can market and sell a device.  *Id.*, ¶ 13.

The acetabular shell component of the Dynasty Device has several variations, including "the 'Thick Shell' (with a 5 mm wall thickness), the 'Thin Shell' (with a 3 to 4 mm wall thickness), the 'Spiked Shell' (with spikes), and the 'HA Shell' (with a hydroxyl apatite coating to facilitate bony ingrowth)."  *Id.* at 4, ¶ 15.  Although defendant obtained 510(k) Clearance to market the Spiked Shell in 2003 and the HA Shell and Thick Shell in 2004, defendant failed to seek 510(k) Clearance for the Thin Shell until November 2011, even though 90% of the Dynasty Devices sold between 2003 and 2011 utilized the Thin Shell.  *Id.*, ¶¶ 16, 18.  Defendant did not receive clearance from the FDA to market the Thin Shell until February 2012, when defendant had already stopped marketing the Dynasty Device.  *Id.*, ¶¶ 18, 19.

Defendant's involvement in the hip-replacement device industry began in December 1994, when it purchased Orthomet, Inc. ("Orthomet").  *Id.* at 4–5, ¶¶ 20–21.  At

---

[2] "A 510(k) notice is a premarket submission in which the manufacturer claims the submitted device is substantially equivalent to a predicate device that is already on the market."  *Id.* at 8, ¶ 45.

that time, most hip-replacement devices used a press-fit metal shell with porous coating and a separate polyethylene liner with a ceramic or metal head ("MoP devices"), but Orthomet was in the development stages of two metal-on-metal ("MoM") hip-replacement systems: the Transcend MoM Total Hip System (which later became the Conserve® Total Hip Device) and the Conserve® Resurfacing Device.  *Id.* at 5, ¶¶ 21, 23.  In November 1995, two employees of defendant attended a four-day "MoM summit, open discussion, debate, and dialogue" about MoM hip replacements, at which experts concluded that MoM devices may not be a good alternative to MoP devices and that more research was needed to assess the risks that MoM devices posed.  *Id.* at 6, ¶¶ 28–29.  The same year, before defendant's marketing of the Dynasty Device, leading surgeons and designers notified defendant "of a number of major MoM risks that demanded further testing," including: "metal toxicity, inflammation, bone loss, allergic reaction, local tumor formation, systemic effects, soft tissue necrosis, osteolysis, and blood-borne metal ions."  *Id.*, ¶ 30.  Despite this information, defendant did not study these known risks before marketing the Dynasty Devices or their components.  *Id.*, ¶ 31.

In addition to the Dynasty Device, defendant manufactured a separate hip device, the Conserve® Plus Resurfacing Hip System (the "Conserve Plus Device").  *Id.* at 6–7, ¶¶ 32–39.  In 2000, defendant initiated clinical studies of the Conserve Plus Device and, in 2003, defendant submitted a PMA application for the Conserve Plus Device using the Thick Shell.  *Id.*, ¶¶ 32–33.  Defendant sought to add a Thin Shell to the Conserve Plus Device PMA submission, but the clinical data from Investigational Device Exemption ("IDE") testing showed such high failure rates when utilizing the Thin Shell that defendant withdrew the Thin Shell from its PMA application at least twice between 2003 and

November 2011.[3]  *Id.* at 7, ¶ 39.  Specifically, the data reflected a revision rate – i.e., a failure of the hip-replacement device requiring a surgery to replace its components – of 18.6% of the patients who received the Conserve Plus Device with the Thin Shell after 24 months.  *Id.* at 8, at ¶ 40.  Despite these failures in the clinical trials, defendant marketed and sold MoM devices, including the Dynasty Device, using the Thin Shell from 2003 to 2011 without PMA or 510(k) Clearance and without informing surgeons or patients of the high revision rate observed during the clinical trials.  *Id.*, ¶¶ 41–42.  The FDA found that defendant had "under-reported Thin Shell failures and that the Thin Shell's revision rate exceeded 33% in [defendant's] clinical studies."  *Id.*, ¶ 43.

In 2003, defendant introduced the Thin Shell into the Dynasty Device without notification to the FDA, PMA, or 510(k) Clearance.  *Id.* at 9, ¶ 54.  Instead, defendant used a "Letter to File," "an internal . . . decision [by defendant] to market the Thin Shell without notice to the FDA . . . based on the supposed 'Minor Modification' to other substantially similar devices on the market."  *Id.*, ¶ 55.  Defendant allegedly "did not conduct any clinical testing beyond the failed IDE to evaluate whether the change from a Thick Shell to a Thin Shell affected safety or efficacy."  *Id.* at 10, ¶ 58.  In September 2011, defendant "acknowledged that the Thin Shell design marketed under the February 13, 2003 Letter to File . . . presented a new[,] worse case (thinner shell) and therefore should have been submitted to FDA for review under the 510(k) [Clearance] process before marketing and sale of the . . . Thin Shell began in 2003."  *Id.*, at ¶ 61.

---

[3] "An IDE [study] allows a non-cleared, non-approved medical device to be used as part of a clinical study to collect data as to safety and efficacy to support a PMA application or 510(k) [Clearance] submission to the FDA."  *Id.* ¶ 32 n.1.  In July 2004, the FDA placed defendant on an Integrity Hold for regulatory violations related to the Conserve Plus Device and IDE study, and defendant remained on an Integrity Hold until September 2007.  *Id.*, ¶¶ 36, 38.

### B.  Defendant's Marketing of the Dynasty Device

Defendant marketed the Dynasty Device to surgeons "as capable of increasing range of motion, decreasing dislocation issues, lower wear, and biocompatibility, all of which were presented as significant benefits for young and active recipients as well as anyone possessing a high-demand hip."  *Id.* at 11, ¶ 64.  Defendant also promoted the biocompatibility and longevity of the device.  *Id.* at 14, ¶ 70.  Defendant marketed the Dynasty Device in a variety of media aimed at surgeons and younger, more active consumers, including "websites, journal ads, brochures, pamphlets, patient testimonials, endorsements, newspaper articles and other PR."  *Id.* at 11, ¶ 67.  Defendant hired professional tennis player and celebrity Jimmy Connors as a spokesperson to endorse and market its MoM Devices.  *Id.*, ¶ 66.  Defendant represented that Mr. Connors was back on the tennis court within six weeks of receiving his new MoM device and that patients implanted with defendant's MoM devices should expect similar results.  *Id.* Defendant's marketing also included testimonials from patients and surgeons indicating a return to "vigorous activities" after surgery and that the Dynasty Device would last 25 to 30 years.  *Id.* at 13, ¶ 69.

Before, during, and after defendant designed, marketed, and sold the Dynasty Device, defendant "knew of the principles and concerns associated with MoM devices generating wear debris and releasing toxic cobalt and chromium heavy metal ions" and that "patients with MoM hip implants exhibited 10 times higher concentrations of metal ions compared to patients with MoP hip implants."  *Id.* at 14–15, ¶¶ 79, 84.  Defendant knew that surgeons and researchers were concerned that MoM devices would generate wear debris and release toxic cobalt and chromium heavy metal ions.  *Id.* at 14–15, ¶¶ 78, 81, 83.  Specifically, defendant knew in 1998 that research indicated that, three years

after implantation, patients exhibited "as much as a 5X increase in the concentration of chromium in the serum and 8X increase in the concentration of chromium in the urine for [MoM] versus [MoP Devices]." *Id.* at 15, ¶ 81. Defendant further knew that cobalt and chromium ions have "toxic effects" and cause "metallosis, necrosis, inflammation, bone loss, cup loosening, ALVAL and pseudotumors." *Id.* at 15–16, ¶¶ 85–86. Despite this knowledge, defendant did not know, and did not conduct studies to assess the level of metal ions released from the Dynasty Device or the device's health effects. *Id.* at 16–17, ¶¶ 89–96. Instead, defendant "disregarded field concerns over metal ion issues" and "focused extensively on minimizing metal-ion concerns through publications and speakers." *Id.* at 17–18, ¶¶ 98, 101. Defendant "told surgeons that [it] had no negative reports for metal ion issues" and that "metal ions from [the Dynasty Device] are harmless." *Id.*, ¶¶ 100–101. In reality, defendant received complaints at least as early as 2007 from numerous surgeons regarding metal debris, reactions, pseudotumors, and other ailments associated with defendant's MoM Devices, including the Dynasty Device, that required revision surgeries. *Id.* at 20–22, ¶¶ 123, 125–34, 138. Defendant, however, did not reveal these complaints to surgeons, distributors, or patients. *Id.* at 20, 22, 28 ¶¶ 121, 137, 165.

### C. Plaintiff's Hip Replacement

At an unspecified time, defendant told Dr. Gary W. Hess "that the cobalt chromium head, liner, and cup articulation [in the Dynasty Device] should last longer than a traditional Metal/Poly liner, and that there were no known issues associated with cobalt and chromium ions." *Id.* at 19, ¶ 109. On Dr. Hess's recommendation, plaintiff decided to proceed with an elective right-side total hip replacement using the Dynasty Device with the Thin Shell. *Id.*, ¶ 110. Plaintiff elected this surgery based on information that Dr. Hess

received from defendant, which Dr. Hess passed on to plaintiff, "about the benefits of the [Dynasty Device]" and defendant's claim that there were "no known risks from metal ions." *Id.*  On or about June 7, 2010, Dr. Hess implanted the Dynasty Device.  *Id.* at 19, 23, ¶¶ 110–11, 141–42.  Dr. Hess is now aware of the risks associated with the Dynasty Device, including adverse reaction, metal ions, metallosis, and necrotic tissues, which he was not aware of at the time of the surgery, and he has indicated that, had he known about these risks, he would not have implanted the Dynasty Device in plaintiff.  *Id.* at 20, ¶¶ 118–19.

In April 2019, plaintiff began experiencing failure of the joint with increasing pain in his right hip when he was active.  *Id.* at 19, ¶ 112.  On or about April 2, 2019, plaintiff entered the hospital for right hip revision surgery due to a failed right total hip arthroplasty that Dr. Jason M. Jennings, who recommended the revision surgery, performed.  *Id.* at 19, 25, ¶¶ 113–14, 151.  Dr. Jennings "noted evidence of elevated cobalt chromium levels, a classic indicator of metallosis, or damage to the hip joint secondary to the generation of metal wear and debris."  *Id.* at 19, ¶ 114.  Dr. Jennings indicated that plaintiff's Dynasty Device "had failed due to metallosis, i.e., acute onset of pain, high cobalt chromium levels, soft tissue inflammation."  *Id.*, ¶ 115.

**D.  The Current Lawsuit**

Plaintiff brings eight claims against defendant based upon the allegedly faulty Dynasty Device: negligent design and failure to warn or instruct (Count 1), negligent misrepresentation (Count 2), fraud by concealment (Count 3), fraudulent misrepresentation (Count 4), strict products liability based on defective design (Count 5), strict products liability based on manufacturing defect (Count 6), strict products liability based on a failure to warn (Count 7), and punitive damages (Count 8).  *Id.* at 36–50,

7

¶¶ 204–87.[4]  Plaintiff seeks special damages, past and future loss of earnings and/or earning capacity, past and future general damages, exemplary and punitive damages, pre-judgment and post-judgment interest, and costs and attorneys' fees.  *Id.* at 50.

Defendant seeks to dismiss plaintiff's negligent misrepresentation, fraud by concealment, fraudulent misrepresentation, strict products liability based on manufacturing defect, and punitive damages claims.  Docket No. 8 at 1–2.

## II.  STANDARDS OF REVIEW

### A.  Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting Twombly, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with her allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the Court need

---

[4]  Paragraph 287 is incorrectly identified as paragraph 249.

not accept conclusory allegations.  *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B.  Federal Rule of Civil Procedure 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure requires that, in a pleading alleging fraud, the circumstances constituting fraud or mistake must be stated with particularity.  *See Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994) (holding that Rule 9(b) applies to common law fraud claims brought in federal court); *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006); Fed. R. Civ. P. 9(b).  The purpose of the requirement "is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based," to "safeguard[] defendant's reputation and goodwill from improvident charges of wrongdoing," and "to inhibit the institution of strike suits."  *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (quotation omitted).  A complaint alleging fraud must "set forth the time, place and contents of the false representation, the

identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citing *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)). "Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992).

## III. ANALYSIS[5]

Defendant argues that plaintiff's fraud-based claims – Count 2 (negligent misrepresentation), Count 3 (fraud by concealment), and Count 4 (fraudulent misrepresentation) – must be dismissed because plaintiff failed to plead the claims with particularity as required by Rule 9(b).[6]  Docket No. 8 at 3–7.  Defendant also argues that plaintiff's allegations in support of Count 6 are insufficient to state a claim for strict liability manufacturing defect and that Count 8 should be dismissed because there is no independent claim for punitive damages.  *Id.* at 7–8.

---

[5] Because jurisdiction is based on diversity, the Court applies Colorado law.  *See, e.g.*, *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995) ("In a case in which jurisdiction is founded on diversity, we apply the law of the forum state.").  The parties also assume that Colorado law applies.  *See generally* Docket Nos. 8, 15, 22.

[6] Plaintiff does not dispute that Rule 9(b)'s heightened pleading standard applies.  *See generally* Docket No. 15.  Moreover, courts have applied the heightened pleading standard under Rule 9(b) to each of these claims.  *See, e.g.*, *Hockman v. I-Flow, LLC*, No. 17-cv-00261-WYD-KLM, 2017 WL 6622384, at *4 (D. Colo. Dec. 7, 2017) (noting that Rule 9(b)'s particularity requirement applies to fraudulent concealment); *Gunningham v. Standard Fire Ins. Co.*, 07-cv-02538-REB-KLM, 2008 WL 4377451, at *2 (D. Colo. Sept. 19, 2008) (applying Rule 9(b)'s particularity requirement to fraudulent and negligent misrepresentation claims).

### A.  Plaintiff's Fraud-Based Claims

#### 1.  Negligent Misrepresentation and Fraudulent Misrepresentation

To state a claim for negligent misrepresentation, a plaintiff must plausibly allege

that: (1) the defendant negligently gave false information to the plaintiff; (2) the plaintiff

reasonably relied upon the false information; and (3) this reliance was a cause of physical

harm to the plaintiff or a third person that the defendant would expect to put in peril.[7]

*Bloskas v. Murray*, 646 P.2d 907, 914 (Colo. 1982) (applying Restatement (Second) of

Torts § 311 (1965)); *see also* Colo. Jury Instr., Civil 9:3 (2021).  To state a claim for

fraudulent misrepresentation, a plaintiff must plausibly allege: "(1) a fraudulent

misrepresentation of material fact was made by [the defendant]; (2) the [plaintiff] relied on

the misrepresentation[]; (3) the [plaintiff] ha[d] the right to rely on, or w[as] justified in

relying on, the misrepresentation; and (4) the reliance resulted in damages."  *M.D.C./*

*Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994).  Thus, plaintiff's claims for

---

[7] Defendant argues that plaintiff "does not plead an essential element of the [negligent misrepresentation] claim, that the defendant 'supplied information to plaintiff for use in a business transaction with a third party.'"  *Id.* at 4 (quoting *DeVries v. Taylor*, 92-cv-00409-LTB, 1993 WL 331001, at *4 (D. Colo. June 28, 1993) (applying Colorado law and finding that plaintiff could not sustain a negligent misrepresentation claim against defendants who were themselves officers and directors of the entity with whom the business transaction was conducted)).  Defendant, however, appears to conflate the claim of negligent misrepresentation causing financial loss in a business transaction with negligent misrepresentation causing physical harm.  *Compare* Colo. Jury Instr., Civil 9:3 (2021) (setting forth the elements of a claim for negligent misrepresentation causing physical harm without any reference to business transactions) *with* Colo. Jury Instr., Civil 9:4(3) (2021) (setting forth the elements of a claim for negligent misrepresentation causing financial loss in a business transaction and including as an element that "defendant gave . . . information to the plaintiff for the (guidance) (use) of the plaintiff in a business transaction"); *see also RMHB Constr., Inc. v. Builders Ins. Grp.*, 348 F. Supp. 3d 1093, 1101 n.4 (D. Colo. 2018) (noting "that at least two different negligent misrepresentation concepts are recognized in Colorado: (1) negligent misrepresentation causing physical harm; and (2) negligent misrepresentation causing financial loss in a business transaction").  Here, plaintiff alleges physical harm and thus he is not required to allege that defendant supplied information for use in a business transaction.

negligent misrepresentation and fraudulent misrepresentation both require plaintiff to plead with particularity that defendant made false statements that plaintiff reasonably relied upon.  Defendant argues that plaintiff has "fail[ed] to plead the who, what, when, where, and how" of the allegedly false statements.  Docket No. 8 at 4 (quotation omitted).

In the allegations specific to plaintiff's claim for negligent misrepresentation, plaintiff alleges only generally that defendant "made representations about the [Dynasty] Device that it, at a minimum, should have known to be false" and "misrepresented to the medical community, . . . Dr. Hess, Plaintiff . . . , and the public that the [Dynasty Device] presented no risk or a low risk of unreasonable and dangerous adverse side effects."  Docket No. 1 at 39, ¶¶ 223–24. [8]  Similarly, in the allegations specific to plaintiff's claim for fraudulent misrepresentation, plaintiff alleges only generally that defendant "made false representations of material fact to [p]laintiff and/or his healthcare providers as to the safety and efficacy of its [Dynasty Device]" and made certain representations regarding the Dynasty Device "via printed literature and statements to surgeons."  *Id.* at 41, ¶¶ 235–36.  These general statements fail to identify the what, when, where, and how of the statements that plaintiff contends form the basis of his negligent and fraudulent misrepresentation claims.  To the extent plaintiff describes the content of the purportedly false statements that defendant allegedly made about the Dynasty Device, plaintiff fails to identify, for each of those statements, when it was made, to whom, by whom, and in what

---

[8] Plaintiff also alleges that defendant had a duty to tell the medical community, plaintiff, and the public that the Dynasty Device "had not been adequately tested nor found to be safe and effective."  *Id.*, ¶ 223.  To the extent that plaintiff attempts to state a claim for negligent nondisclosure, such claim fails as a matter of law.  *See Martin v. Chinese Child. Adoption Int'l*, No. 19-cv-02305-STV, 2020 WL 6585796, at *13–14 (D. Colo. Nov. 10, 2020) (conducting extensive *Erie* analysis of Colorado law in holding that negligent misrepresentation must be grounded in affirmative statements).

format or context.  Plaintiff's generalized allegations are insufficient "to afford defendant fair notice of [] plaintiff's claim and the factual ground upon which it is based" and thus are insufficient to satisfy Rule 9(b).  *See Farlow*, 956 F.2d at 987.

Although the factual background section of the complaint includes more specific factual allegations, those allegations, too, are insufficient to identify the specific content of the allegedly false statements and when, where, and how the statements were allegedly made.[9]  For example, plaintiff alleges that defendant marketed the Dynasty Device by contending that it "resulted in less wear, less metal debris and, by implication, fewer metal ions," that it produced "fewer metal ions," and that the ions were "harmless," *see* Docket No. 1 at 17–18, ¶¶ 100, 105, but plaintiff fails to quote any specific statement(s) that defendant allegedly made, and plaintiff does not provide any identifying information regarding when, to whom, or in what format defendant allegedly made the statements.[10]

---

[9] Defendant argues that plaintiff's fraud and negligent misrepresentation claims are deficient because plaintiff has not specifically identified who made the allegedly fraudulent statements.  Docket No. 8 at 4, 6.  Plaintiff responds that "the natural person within a corporate defendant who committed the act of fraud need not be named by the plaintiff for the complaint to be sufficiently particular as to the [d]efendant's identity under Rule 9(b)."  Docket No. 15 at 5.  Without more information about the specific statements that form the basis of plaintiff's fraud and negligent misrepresentation claims and the form in which those statements were allegedly delivered, the Court is unable to assess whether plaintiff is required to identify the specific individual within defendant who made the statements. *Compare Bus. Loan Express, LLC v. Faith Ventures, Inc.*, 2008 WL 11338444, at *3 n. 4 (W.D. Okla. July 30, 2008) (finding that "the identity of the natural person within the corporate defendant is not an essential allegation if the corporation itself is the alleged perpetrator of the fraud") *with George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016) (finding allegations insufficient to satisfy Rule 9(b) where plaintiff alleged that he "spoke with unidentified . . . employees [of defendant] who made false representations to him via phone").

[10] Plaintiff alleges that defendant, "as early as 2002, told its sales personnel, who were in direct contact with surgeons, that, 'the effects of metal ion release are known and have been demonstrated to be safe.'"  *Id.* at 18, ¶ 103.  Although somewhat more specific in that the allegation includes a quotation, timeframe, and the group of people to whom the

Instead, plaintiff alleges only that defendant made these statements "in its marketing" or to surgeons.[11] *Id.*, ¶¶ 100–01. Plaintiff includes only one allegation that identifies a representation that defendant allegedly made to someone involved with plaintiff's care (and, even then, not to plaintiff directly). Specifically, plaintiff alleges that defendant "told [Dr. Hess] . . . that the cobalt chromium head, liner, and cup articulation should last longer than a traditional Metal/Poly liner, and that there were no known issues associated with cobalt and chromium ions." *Id.* at 19, ¶ 109. Plaintiff, however, fails to specify when, where, in what format, or by whom the statement was made. Nor does plaintiff allege that Dr. Hess conveyed these specific statements to plaintiff. Instead, plaintiff alleges only vaguely that he decided to proceed with surgery "[b]ased on Dr. Hess's information from [defendant] about the benefits of the [Dynasty Device] and no known risks from metal ions, and [Dr. Hess's] recommendation."[12] *Id.*, ¶ 110.

---

statement was made, plaintiff fails to connect this statement – allegedly made to defendant's own sales personnel – to himself or his medical providers.

[11] The complaint includes an image of a "[r]epresentative ad," *id.* at 12–13, ¶ 68, but that advertisement is for the "CONSERVE® Family of Products," rather than the Dynasty Device at issue in this case and, regardless, plaintiff provides no information regarding to whom the advertisement was distributed or when, and plaintiff does not specifically identify any statements in the advertisement that he contends are false.

[12] Plaintiff contends that the representations allegedly made to Dr. Hess "support [p]laintiff's fraud-based claims due to the learned intermediary doctrine, which allows [defendant] and other providers of medical products to inform a doctor or pharmacist about the potential hazards of their products instead of those who use or consume the products." Docket No. 15 at 6 (citing *Shostrom v. Ethicon, Inc.*, No. 20-cv-1933-WJM-STV, 2021 WL 778994, at *7 (D. Colo. Mar. 1, 2021)). In reply, defendant contends that "the learned intermediary doctrine cannot be used to uphold a fraud claim," because it "deals solely with a manufacturer's liability for failure to warn." Docket No. 22 at 4. Because plaintiff has not identified with particularity any false statement(s) that defendant allegedly made to Dr. Hess, the Court does not consider whether plaintiff's fraud-based claims may be based upon statements made by defendant to Dr. Hess pursuant to the learned intermediary doctrine.

Plaintiff argues that he "is not aware of the exact time and place these representations [to Dr. Hess] were made . . . because the[y] were made to his implanting surgeon outside his presence."  Docket No. 15 at 6.  Although plaintiff contends that "such information is peculiarly within [defendant's] knowledge," *id.*, and that Dr. Hess also is aware of the information, plaintiff offers no explanation for why or how plaintiff was able to discover the existence and content of the alleged statements, but not discover the time and means through which they were made.  Although plaintiff's allegations may be based upon information and belief, to the extent the facts in question are peculiarly within defendant's knowledge, plaintiff must set forth a factual basis to support his beliefs, which plaintiff here has not done.  *See Scheidt*, 956 F.2d at 967; *Koch*, 203 F.3d at 1237 (finding allegations insufficient under Rule 9(b) where the complaint "did not state that the [p]laintiffs' allegations of fraud were based on information and belief" or "set forth any factual basis to support such a belief").  Plaintiff does not state that the allegations regarding the statements made to Dr. Hess are based upon information and belief, and plaintiff does not set forth any factual basis to support such a belief.

Accordingly, the Court finds that plaintiff's allegations are insufficient to state a claim for negligent or fraudulent misrepresentation under Rules 9(b) and 12(b)(6).  The Court will thus grant defendant's motion with respect to these claims.

### 2.  Fraudulent Concealment

A fraudulent concealment claim consists of the following five elements:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011) (quotation omitted).  To allege fraud based on an omission, a plaintiff must identify "the particular information that should have been disclosed, the reason the information should have been disclosed, the person who should have disclosed it, and the approximate time or circumstances in which the information should have been disclosed*." Martinez v. Nash Finch Co.*, 886 F. Supp. 2d 1212, 1216 (D. Colo. 2012) (quoting *S.E.C. v. Nacchio*, 438 F. Supp. 2d 1266, 1277 (D. Colo. 2006)).

Defendant argues that plaintiff's fraudulent concealment claim is not pled with particularity under Rule 9(b) because plaintiff does not allege (1) how defendant concealed information or the method of concealment; (2) who should have disclosed the correct information; (3) that defendant intended for plaintiff to act upon the concealment; or (4) when such concealment is alleged to have taken place.  Docket No. 8 at 6.

The Court finds that plaintiff has adequately alleged the information that was concealed and how defendant concealed it.  Plaintiff alleges that one of the components of the Dynasty Device – the Thin Shell – went through clinical testing and exhibited an 18.6% failure rate after 24 months, yet defendant allegedly marketed its MoM devices utilizing the Thin Shell without informing surgeons or patients of these clinical studies. Docket No. 1 at 7–8, ¶¶ 40–42.[13]  Plaintiff further alleges that, before defendant manufactured and marketed the Dynasty Device, defendant was aware that MoM devices produce ten times more toxic ions than traditional MoP devices, but defendant did not test to determine the risks that the ions posed and did not inform surgeons or patients of defendant's concerns or lack of knowledge regarding the release of metal ions from the

---

[13] Although the relevant study allegedly was performed using Conserve devices, plaintiff alleges that the same Thin Shell was utilized in the Dynasty Device.  *Id.* at 8, ¶ 41.

Dynasty Device.  *Id.* at 15, 17–18, ¶¶ 84, 96, 102.  Plaintiff also alleges that defendant was aware that the Dynasty Device had high failure rates because consultants, researchers, and surgeons were reporting failure rates to defendant, yet defendant failed to disclose the failure rate or other concerns to surgeons or patients.  *Id.* at 20–22, ¶¶ 121–22, 137.  Plaintiff provides specific examples of surgeons reporting high failure rates and concerns to defendant that went undisclosed.  *See id.*, ¶¶ 123–137.  Plaintiff further alleges that defendant concealed this information by failing to include it in marketing materials and communications with patients and surgeons – including plaintiff and plaintiff's surgeon – despite defendant publishing marketing materials and communicating with surgeons.  *Id.* at 17, 19, 40 ¶¶ 98, 100, 109, 228–29.  The Court finds these allegations sufficient to allege with particularity the information that defendant allegedly failed to disclose, as well as the method of concealment.[14]

Defendant argues that plaintiff was required to plead with specificity "who should have disclosed" this information.  Docket No. 8 at 6.  Although plaintiff has not identified the specific employees of defendant who failed to disclose the information, as explained previously, plaintiff sufficiently alleges that defendant (as an entity) was aware of specific information that it should have disclosed and that defendant intentionally concealed that information from marketing materials, surgeons, and patients.  The Court finds plaintiff's allegations sufficient, given that the identity of the specific employees who had the

---

[14] Plaintiff also sufficiently alleges that this information was material by alleging that, had he or his surgeon known this information about the Dynasty Device, his surgeon would not have recommended the Dynasty Device, and plaintiff would not have agreed to have it implanted.  *Id.* at 20, 40 ¶¶ 119, 233.  Plaintiff further alleges that "[n]either [he] . . . nor his implanting surgeon could have discovered this information through reasonable diligence."  *Id.* at 40, ¶ 230.

relevant knowledge and who were responsible for the alleged decisions to conceal it likely are solely within defendant's knowledge.[15]  *See George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016) ("[I]n determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control."); *Doll v. Ford Motor Co.,* 814 F. Supp. 2d 526, 538 (D. Md. 2011) (finding that "Rule 9(b)'s particularity requirements are relaxed" with regard to claims for fraudulent concealment based upon omissions because "omissions cannot be described in terms of the time, place, and contents of the misrepresentation"); *Hockman v. I-Flow, LLC*, No. 17-cv-00261-WYD-KLM, 2017 WL 6622384, at *3 (D. Colo. Dec. 7, 2017) (finding sufficient particularity for fraud-based claims where plaintiff did not allege "specific sales representatives" because "[i]t is unreasonable to expect that [the p]laintiff would know" that prior to discovery).

With respect to intent, plaintiff has alleged that (1) defendant's biggest concern in selling the Dynasty Device "was the issue of metal ion release, as surgeons' top concern was the metal ions," Docket No. 1 at 14, ¶ 78; (2) defendant "knew that surgeons were concerned about metal ion release and its effects on the body," *id.* at 15, ¶ 83, and (3), despite these concerns, defendant "did not inform surgeons or potential patients of its concerns or lack of knowledge regarding the release of Cobalt and Chromium ions from [the Dynasty Device]" and instead "focused extensively on minimizing metal-ion concerns through publications and speakers."  *Id.* at 17–18, ¶¶ 98, 102.  Plaintiff further alleges that defendant "knew the [Dynasty Device] was failing at higher[-]than[-]expected rates from

---

[15] Defendant appears to concede this point in its reply, stating "even if [p]laintiff is not required to identify an individual employee of [Defendant], he is undoubtedly required to state the time, place, and contents of the false representations."  Docket No. 22 at 3.

fretting and corrosion of the articulating surface" and that numerous surgeons no longer used the Dynasty Device for this reason, yet defendant intentionally did not disclose this information. *Id.* at 20, 27–28, ¶¶ 121, 122, 163. Instead, defendant allegedly "created a smokescreen by isolating and blaming surgeons who reported failures[ and] telling reporting surgeons that no other surgeons around the country were having failures." *Id.* at 22, ¶ 135. The Court finds these allegations sufficient to allege that defendant intentionally concealed material facts about the risks and potential harm that the Dynasty Device caused.[16]

Finally, defendant argues that plaintiff did not set forth the time period for the alleged concealment. The Court, however, finds plaintiff's allegations sufficient to establish that the concealment was ongoing from when defendant knew of the Dynasty Device's failures until plaintiff received the Dynasty Device implant. For example, plaintiff alleges that, as of 1998, defendant knew that there were significantly higher concentrations of ions in patients with MoM versus MoP hip-replacement devices at three years post-implantation. *Id.* at 15, ¶ 81. In or around 2007, defendant allegedly began receiving complaints from surgeons about the high failure rates of the Dynasty Device and the decision by surgeons to stop using the device, yet defendant failed to disclose this information to patients and other surgeons prior to plaintiff being implanted with the Dynasty Device in June 2010. *Id.* at 19, 20–22, ¶¶ 111, 123–134, 137. The Court finds these allegations sufficient to put defendant on notice as to when the alleged concealment occurred. *See Hockman*, 2017 WL 6622384, at *3 (finding particularity met when plaintiff only "allege[d] a general time frame for the misrepresentation and concealment"); *Wells v.*

---

[16] Rule 9(b) expressly states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

*Johnson & Johnson*, 2021 WL 3578191, at *4 (W.D. Okla. Aug. 12, 2021) (explaining that Rule 9(b) "does not require a plaintiff to specify the *exact* time and place that the alleged fraud occurred").  The Court will therefore deny defendant's motion with respect to plaintiff's fraudulent concealment claim.

### B. Plaintiff's Strict Liability Manufacturing Defect Claim

"Colorado has 'expressly adopted the doctrine of strict liability in tort, based on the Restatement (Second) of Torts § 402A."[17]  *Wollam v. Wright Med. Grp., Inc.*, No. 10-cv-3104-DME-BNB, 2012 WL 4510695, at *2 (D. Colo. Sept. 30, 2012) (quoting *Union Supply Co. v. Pust*, 583 P.2d 276, 280 (Colo. 1978)); *see also Walker v. Ford Motor Co.*, 406 P.3d 845, 849 (Colo. 2017) (noting that Colorado "look[s] to the doctrine of strict products liability as set forth in section 402A of the Restatement (Second) of Torts"). "Under section 402A, a manufacturer may be held strictly liable for harm caused by any product in a defective condition unreasonably dangerous to the user or consumer." *Walker*, 406 P.3d at 849 (quotation omitted).  "A product may be in such a condition due to a manufacturing defect, which causes the product to fail to conform to the manufacturer's specifications, or due to a failure to warn or a design defect that renders the product unreasonably dangerous despite the fact that it was manufactured exactly as intended."  *Id.*  Colorado thus "recognizes 'three general areas of the manufacturing

---

[17] Restatement (Second) of Torts § 402A(1) states:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

process that lead to strict liability claims . . . : (1) [p]hysical flaws due to improper manufacture; (2) inadequacies in [d]esign; and (3) inadequate [w]arnings concerning the hazards or proper methods for safe use.'" *Wollam*, 2012 WL 4510695, at *2 (quoting *Union Supply Co.*, 583 P.2d at 280 n.1). Plaintiff has asserted separate claims for all three types of strict liability; however, defendant only seeks dismissal of the manufacturing defect claim.[18] Docket No. 8 at 7–8.

Courts in this District have found that, to succeed on a strict liability claim premised on a manufacturing defect, a plaintiff must prove:

> [1] the defendant manufactured the product, engaged in the business of selling the product, and sold the product; [2] the product was defective and, because of the defect, was unreasonably dangerous to a person who might reasonably be expected to use it; [3] the product was defective at the time the manufacturer sold it; [4] the product was expected to, and did, reach the user without substantial change; [5] plaintiff was a person reasonably expected to use the product, was injured, and the product's defect caused plaintiff's injuries.

*Wollam*, 2012 WL 4510695, at *2 n.2 (citing *Price*, 2005 WL 1677512, at *3). Although not an express element of the claim, the Colorado Supreme Court has stated that "[t]he question in manufacturing defect cases is whether the product as produced conformed with the manufacturer's specifications." *Camacho v. Honda Motor Co.*, 741 P.2d 1240,

---

[18] The Colorado Civil Jury Instructions – consistent with the Restatement (Second) of Torts § 402A – do not distinguish between strict liability claims based upon a design defect and those based upon a manufacturing defect. *See* Colo. Jury Inst., Civil 14:1 (2021) (setting forth elements of a claim for strict product liability); *Price v. Wilson Sporting Goods Co.*, No. 03-cv-02639-WYD, 2005 WL 1677512, at *3 (D. Colo. July 18, 2005) (noting that the Colorado jury instructions reflect the Restatement). Because plaintiff has asserted these two claims as separate causes of action, both parties have treated them as distinct claims in their briefing on the motion to dismiss. Certain courts within this District have considered such claims as having distinct elements. The Court will also consider plaintiff's design and manufacturing defect claims as distinct. *See Wollam*, 2012 WL 4510695, at *2 n.2 (noting similar but separate elements for design defect and manufacturing defect claims); *Mariani v. Titeflex Corp.*, No. 13-cv-01720-MSK-BNB, 2014 WL 3402514, at *6 (D. Colo. July 10, 2014) (same).

1247 (Colo. 1987).

Defendant argues that plaintiff's manufacturing defect claim should be dismissed because plaintiff "failed to plead how the product he received differed from other products with the same design." Docket No. 8 at 7. The Court disagrees. Plaintiff alleges that the Dynasty Device was manufactured in such a way as to: (1) "generate . . . metal debris, corrosion and resultant . . . metal ions" and (2) "make the articulating surfaces of the components susceptible to fretting and corrosion," thereby increasing the potential for failure. Docket No. 1 at 26, ¶ 157(a). In addition, plaintiff alleges that "the methods, facilities or controls used for [the] manufacture, packing, storage or installation [of the Dynasty Device] are not in conformity with federal requirements." *Id.* at 34–35, ¶ 195. Plaintiff further alleges that the Dynasty Device that he received was "supplied in a defective condition in its manufacture, such that it would generate metal debris, fretting and corrosion at the head cup interface, rendering it unreasonably dangerous." *Id.* at 46, ¶ 260. Plaintiff contends that, if defendant had followed the federal manufacturing requirements, the Dynasty Device he received "would have been manufactured . . . properly such that it would not have resulted in injuries to [p]laintiff." *Id.* at 35, ¶ 200. The Court finds these allegations sufficient to plausibly allege that there was a manufacturing defect in the Dynasty Device that plaintiff received and to place defendant on sufficient notice of the basis for the manufacturing defect claim.[19]

---

[19] Many of plaintiff's allegations with regard to the alleged manufacturing defect are that the defect resulted from the design or manufacturing of the Dynasty Device. *See, e.g.*, Docket No. 1 at 26, 35, ¶¶ 157, 200. Plaintiff, however, is permitted to plead claims in the alternative. *See Thomas v. ConAgra Foods, Inc.*, 2021 WL 1176011, at *3 (W.D.N.Y. Mar. 29, 2021) (noting that at the motion to dismiss stage, "[i]t is not the role of the Court . . . to weigh the plausibility of [a design defect] allegation against the plausibility of [p]laintiff's allegation of a manufacturing defect"); *O'Connor v. BMW of N. Am., LLC*, No.

Defendant next argues that plaintiff's manufacturing defect claim should fail because "the [manufacturing] defect alleged here – that the product would generate metal debris – is the exact same alleged defect [p]laintiff alleges is inherent in the design of the product itself."  Docket No. 8 at 7–8.  The Court is unpersuaded.  Even if plaintiff's design and manufacturing defect claims are internally inconsistent,[20] plaintiff is permitted to plead claims in the alternative.  *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, *regardless of consistency*" (emphasis added)); *United States v. Roe*, 913 F.3d 1285, 1300 n.21 (10th Cir. 2019) ("Fed. R. Civ. P. 8(d) specifically allows for the pleading of inconsistent claims and inconsistent facts"); *Thomas*, 2021 WL 1176011, at *3 (rejecting argument that plaintiff's claim should be dismissed where design defect and manufacturing defect claims were internally inconsistent, because "plaintiffs are allowed to assert inconsistent facts in support of alternative claims, and courts may not construe allegations regarding one claim to be an admission against another" (quotation and citation omitted)).  The Court thus finds that plaintiff "is fully entitled to plead claims for both design defect and manufacturing defect in the alternative." *Id.*, at *3 (quotation and citation omitted).  The Court will therefore deny that portion of defendant's motion seeking to dismiss plaintiff's manufacturing defect claim.

### C.  Whether Plaintiff May Assert a Claim for Exemplary Damages

Plaintiff pleads punitive damages as a separate claim and includes "exemplary and

---

18-cv-03190-CMA-STV, 2020 WL 1303285, at *5 (D. Colo. Mar. 19, 2020) (observing that, at the pleading stage, "it [was] unclear what type of defect [design or manufacturing], if any, resulted in" the alleged malfunctioning of the product, but that the plaintiff need only establish that it was plausible that it was a manufacturing defect).

[20] That the design of a product may cause a specific defect does not necessarily preclude the possibility that a defect in the manufacture of the product may exacerbate or otherwise contribute to the overall defect in the product.

punitive damages" in his prayer for relief.  Docket No. 1 at 50, ¶¶ 286–87; *id.* at 50.

Defendant argues that this claim should be dismissed because "punitive damages are not

a standalone cause of action."  Docket No. 8 at 8.  The Court agrees with defendant.  "[A]

claim for exemplary damages is not a separate and distinct cause of action, but rather is

auxiliary to an underlying claim for actual damages."  *Kirk v. Denver Pub. Co.*, 818 P.2d

262, 265 (Colo. 1991) (quotations omitted); *see also Jackson v. Johns*, 714 F. Supp.

1126, 1131 (D. Colo. 1989) ("A request for punitive damages is not a separate claim for

relief but rather, is a prayer for damages.").  Accordingly, the Court will dismiss plaintiff's

punitive damages claim without prejudice to plaintiff seeking punitive damages in his

prayer for relief.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's Partial Motion to Dismiss Plaintiff's Complaint [Docket

No. 8] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that plaintiff's second, fourth, and eighth claims, for negligent

misrepresentation, fraudulent misrepresentation, and punitive damages, respectively, are

**DISMISSED with prejudice**.[21]

---

[21] In his response, plaintiff asks for leave to amend his complaint.  Docket No. 15 at 9–10.
Pursuant to the Local Rules, however, "[a] motion shall not be included in a response or
reply to the original motion.  A motion shall be filed as a separate document."
D.C.COLO.LCivR 7.1(d).  The Local Rules also require a party seeking to file an amended
pleading to attach the proposed amended pleading.  D.C.COLO.LCivR 15.1(b).  Plaintiff
did not do so.  The Tenth Circuit recognizes "the importance of Fed. R. Civ. P. 7(b) and
ha[s] held that normally a court need not grant leave to amend when a party fails to file a
formal motion."  *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186
(10th Cir. 1999); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*,
956 F.3d 1228, 1236 (10th Cir. 2020) ("[C]ases are not to be litigated piecemeal.  The
court should not have to address repeated "improvements" to the complaint.  When a

DATED March 25, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

party faces a motion to dismiss and it believes that it can overcome objections with an amendment to the pleading, it should seek leave to amend at that time."); *Johnson v. Spencer*, 950 F.3d 680, 721 (10th Cir. 2020) ("A district court may deny leave to amend when a plaintiff fails to file a written motion and instead merely suggest[s] she should be allowed to amend if the court conclude[s] her pleadings [a]re infirm." (quotations omitted; alteration in original); *Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 706 (10th Cir. 2014) (affirming prejudicial dismissal and denial of request to amend made in response to motion to dismiss without formal motion); *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1238 n.4 (10th Cir. 2013) ("Where a plaintiff does not move for permission to amend the complaint, the district court commits no error by not granting such leave.").